**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 20-cv-00234-NYW-KLM

ATLANTIC RICHFIELD COMPANY,

  *Plaintiff and Counter Defendant,*

v.

NL INDUSTRIES, INC., and
NL ENVIRONMENTAL MANAGEMENT SERVICES,

  *Defendants and Counter Claimants.*

---

## MEMORANDUM OPINION AND ORDER

---

This matter comes before the Court on Defendants NL Industries, Inc. and NL Environmental Management Services' (collectively, "NL" or "Defendant") Renewed Motion for Partial Summary Judgment ("Motion for Partial Summary Judgment" or "Motion"). [Doc. 202]. The Court finds that oral argument will not materially assist in the resolution of the Motion. Upon review of the record, and for the reasons set forth herein, the Court respectfully **GRANTS IN PART and DENIES IN PART** the Motion for Partial Summary Judgment.

## BACKGROUND[1]

In approximately 1869, mining activities began in Rico, Colorado. [Doc. 97-4 at 2; Doc. 97-5 at 3; Doc. 217-1 at ¶ 1]. ARCO alleges that over the subsequent years, various mining companies, including Rico Mining and Reduction Company ("RMRC") and St. Louis Smelting

---

[1] Unless otherwise indicated, the Court draws the following facts from the First Amended Complaint, [Doc. 171], and provides them here solely as background, not as undisputed factual assertions.

and Refining Co. ("St. Louis"), mined in Rico, Colorado.  [Doc. 171 at ¶¶ 15–16]; *see also*  [Doc. 97-4 at 2; Doc. 217-1 at ¶ 2].   Between 1930 and 1941, St. Louis constructed the approximately 6000-foot St. Louis Tunnel through which acid mine drainage ("AMD") flowed into the Delores River.  [Doc. 171 at ¶ 17].  NL is the alleged successor to St. Louis and RMRC, which conducted operations at the ARCO Site prior to 1943.  [*Id.* at ¶¶ 7–8].  By 1943, all mining operations performed by the alleged predecessors of NL at the ARCO Site had ceased.  [Doc. 217-1 at ¶ 5 (citing [Doc. 171 at ¶ 22])].  In the 1950s, a crosscut from the Argentine Mine on the Silver Creek to the St. Louis Tunnel on the Dolores River was completed.  [Doc. 217-30 at 43; Doc. 217-1 at ¶ 8].[2]  This caused the water level in the Silver Creek area workings to drop 450 feet, reducing the impact of drainage at the St. Louis Tunnel and associated settling ponds in Rico, Colorado, but also increased the flow rate from the St. Louis Tunnel.  [Doc. 217-30 at 43; Doc. 217-1 at ¶ 8]. Subsequently, numerous environmental hazards were discovered in an area that came to be known as the Rico-Argentine Site.  [Doc. 217-30 at 43–44].

This case arises out of claims brought by Atlantic Richfield Company ("ARCO" or "Plaintiff") against NL alleging that ARCO has incurred costs and will incur future costs in responding to releases and threatened releases of hazardous substances at certain facilities and locations within the Rico-Argentine Site, near Rico, Dolores County, Colorado.  [Doc. 171 at ¶ 1]. In response to the release of hazardous substances within the Rico-Argentine Site, the United States Environmental Protection Agency (the "EPA" or "the Government") issued a Unilateral Administrative Order (the "UAO") effective March 23, 2011, against ARCO.  *See* [Doc. 217-4].

---

[2] For ease, the Court refers to the 2010 Action Memo that ARCO submitted with its response to the instant Motion.  *See* [Doc. 217-30 at 42–73].  Notably, the 2010 Action Memo that NL submitted with the original Motion for Summary Judgment contains an incomplete version of that document.  *See* [Doc. 97-7].

The UAO directed ARCO to "conduct removal actions . . . to abate an imminent and substantial endangerment to the public health or welfare or the environment that may be presented by the actual or threatened release of hazardous substances at or from the Site." [*Id.* at ¶ 2]. ARCO alleges that since March 2011, it has made substantial progress implementing the required response actions as outlined in the UAO, at a cost exceeding $63.7 million. [Doc. 171 at ¶¶ 3, 28].

On January 28, 2020, ARCO brought this civil action against NL pursuant to § 107(a) of the Comprehensive Environmental, Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a) ("Section 107(a)"), which provides for joint and several liability among potentially responsible parties ("PRP"). *See* [Doc. 1]; *see also United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 129 (2007) (noting that Section 107(a) claim imposes joint and several liability among PRPs). Originally, ARCO sought to recover "response costs under CERCLA [S]ection 107(a) . . . to implement the Removal Action required by the UAO" at the Site, on the basis that NL is a PRP. [Doc. 1 at 12]. On June 2, 2021, NL filed a motion for summary judgment arguing that ARCO's claims against it were barred by CERCLA's six-year statute of limitations for "remedial" response actions. [Doc. 97].

Thereafter, on December 6, 2021, ARCO entered into an Administrative Settlement Agreement and Order on Consent for Removal Action (the "AOC") with the EPA, which "settled [ARCO's] liability to the United States for the matters addressed in the AOC." [Doc. 171 at ¶ 4]. The AOC continues the removal action that ARCO began under the UAO. [*Id.*]; *see generally* [Doc. 217-30 at 2–40]. ARCO subsequently moved to amend the operative pleading, arguing that, as a result of its settlement with the United States, it could only pursue a claim for contribution under CERCLA § 113, 42 U.S.C. § 9613 ("Section 113"), rather than cost recovery under Section 107, as a matter of law. [Doc. 153 at 4]. In response, NL agreed that ARCO could no longer

pursue a Section 107(a) claim, but could only pursue a Section 113 claim.  [Doc. 158 at 3].

Nevertheless, NL opposed the amendment, arguing that ARCO should not be permitted to convert

a long-stale Section 107 claim into a contribution claim under Section 113, and that CERCLA

could not be applied retroactively to NL.  [*Id.* at 2]*.*  Over NL's objection, the Court[3] granted

ARCO leave to amend the Complaint.  *See* [Doc. 164 at 12; Doc. 170 at 4].  The Court also denied

the pending motion for summary judgment without prejudice to refiling.  [Doc. 170 at 5].

On May 2, 2022, ARCO filed the operative First Amended Complaint, wherein it asserts

two claims against NL.  *See* [Doc. 171].  In the first claim, ARCO seeks contribution from NL for

its equitably allocated response costs incurred by ARCO as required by the UAO and the AOC

pursuant to CERCLA Section 113(f), 42 U.S.C. § 9613(f) ("Count I").  In the second claim, ARCO

seeks declaratory relief in the form of "a judicial determination of the rights, duties, and obligations

of the parties to this action with respect to the past, present, and future response costs and other

related costs" under CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and the Declaratory

Judgment Act, 28 U.S.C. § 2201 ("Count II").  [*Id.* at 10–14].

NL filed its Answer on May 16, 2022.  [Doc. 172].  In conjunction with its Answer to the

First Amended Complaint, NL filed a Second Amended Third-Party Complaint against the United

States of America ("United States"); El Paso Remediation Company ("El Paso"); Redpath USA

Corporation ("Redpath"); Outlook Resources, Inc. ("Outlook Resources"); Disposition Properties,

LLC ("Disposition Properties"); Chemetall Foote ("Chemetall Foote"); and  Boyles Bros. Drilling

---

[3] Originally, this action was assigned to Chief Judge Philip A. Brimmer and Magistrate Judge Mix.
[Doc. 5].  It was then reassigned to Judge Regina M. Rodriguez, who adopted Judge Mix's
Recommendation for leave to file an amended complaint that dismissed ARCO's Section 107(a)
claim.  [Doc. 110; Doc. 164; Doc. 170].  The case was subsequently reassigned to the undersigned
judicial officer upon her confirmation as a District Judge.  [Doc. 205].

Company ("Boyles Bros.") (collectively, "Third-Party Defendants"), seeking contribution for their respective equitable share of response costs or damages should NL be found liable to ARCO. [*Id.*]. Ultimately, the claims against each of these Third-Party Defendants have been dismissed, and the only remaining causes of action in this case are between ARCO and NL. *See* [Doc. 236; Doc. 242].

NL filed the instant Motion for Partial Summary Judgment on August 2, 2022. [Doc. 202]. In the Motion, NL renews its arguments with respect to the application of CERCLA's statute of limitations and seeks partial summary judgment against ARCO on the grounds that its claims, "with the exception of a $400,000 payment made to reimburse the United States" under the AOC, are time-barred. [*Id.* at 4]. ARCO responded on September 6, 2022, [Doc. 217], and NL replied on October 4, 2022, [Doc. 221]. The Motion for Partial Summary Judgment is thus ripe for disposition.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted). It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). At all times, the Court will "view the factual record and draw all reasonable

inferences therefrom most favorably to the nonmovant." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of a party's case or a denial of an opponent's allegation" to defeat summary judgment). In considering the nonmovant's evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). Further, the Court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial—only the substance must be admissible at trial. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). For instance, "if th[e] evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## ANALYSIS

In 1980, Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). The Act was designed to promote timely clean-up of hazardous waste and to

shift the cost of such clean-up to those parties responsible for the contamination.  *Id.*  "CERCLA holds 'covered persons'—i.e., persons liable for a release or threatened release of hazardous substances from the facility—strictly liable for remedial action and other necessary response costs."  *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1270 (10th Cir. 2017) (citing 42 U.S.C. § 9607(a)(4)) (internal quotations and footnote omitted).  There are four broad categories of covered persons, known as "potentially responsible parties" or "PRPs":  (1) owners; (2) operators; (3) arrangers; and (4) transporters.  *Id.*

When the Government identifies a contaminated site, the Government may pay for the clean-up itself, and then recover its response costs from PRPs through a civil action filed pursuant to CERCLA Section 107.  42 U.S.C. §§ 9604, 9607(a)(4).  Alternatively, the Government can compel a PRP to clean up a site through issuing a unilateral administrative order requiring the PRP to remediate the site using methods identified by the Government, or face fines and treble damages. 42 U.S.C. §§ 9606(a), (b)(1), 9607(c)(3); *cf. New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1231 n.12, 1234 (10th Cir. 2006).  The Government may also enter an agreement with a PRP that requires the PRP to clean up the site.  *Gen. Elec. Co.*, 467 F.3d at 1231 n.12.

As noted by the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit"), CERCLA "creates a complicated network of cost-shifting provisions, which apply depending upon who pays what and why."  *Hobart Corp. v. Waste Mgmt of Ohio, Inc.*, 758 F.3d 757, 762 (6th Cir. 2014).  A private party who pays for environmental clean-up costs under CERCLA may bring two types of actions against other PRPs to recoup a portion of such costs: cost-recovery actions under Section 107(a), 42 U.S.C. § 9607(a), and contribution actions under Section 113(f), 42 U.S.C. § 9613(f).  *See United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 131–32 (2007); *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1206 (10th Cir. 2009) (citing *Young v. United States*, 394 F.3d 858,

862 (10th Cir.2005)).  Section 113(f) provides that "[a]any person may seek contribution from any other person who is liable or potentially liable under [Section 107(a)], during or following any civil action" brought under Section 106 or Section 107; or after a resolution of liability to the United States or a State "for some or all of a response action[4] or for some or all of the costs of such action in an administrative or judicially approved settlement . . . from any person who is not a party to [the] settlement."  42 U.S.C. §§ 9613(f)(1), (3).

## I.    Evidence Before the Court

The Court first considers what evidence is before it.  As discussed above, the Court's analysis here is limited only to admissible evidence.  *See Gross*, 53 F.3d at 1541.  In a footnote in its Response to the Motion, ARCO contends that the Declaration of John Powers ("Powers Declaration"), *see* [Doc. 97-1], the in-house attorney for NL, should be disregarded because it contains "assertions of fact for which NL's attorney fails to show that he has any personal knowledge."  [Doc. 217 at 9 n.1].

As an initial matter, this Court generally does not permit the incorporation of one motion into another.  *See* [Doc. 202 at 8 ("Thus, NL now renews its prior Motion and incorporates all the arguments previously set forth herein.")].  NL cites no authority that permits it to incorporate one motion into another.  *See* [*id.*].  The only Federal Rule of Civil Procedure that contemplates incorporation by reference is Rule 10(c), which provides "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."  Fed. R. Civ. P. 10(c).  A pleading is defined as "(1) a complaint; (2) an answer to a complaint; (3) an

---

4 "A 'response' is a term of art in CERCLA that encompasses both short-term 'removal' actions and more permanent 'remedies' or 'remedial actions.'"  *Hobart*, 937 F.3d at 930 (citing 42 U.S.C. § 9601(25)).

answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer."  Fed. R. Civ. P. 7(a).  Under the plain language of Rule 10(c), incorporation by reference only extends to incorporating matters in the context of a pleading.

Nevertheless, this Court notes that NL has relied upon evidence from its original motion to support its recitation of undisputed facts, to which ARCO has not objected, but has admitted.  *See generally* [Doc. 217-1].  This Court further notes that ARCO simply asserts a general objection to the Powers Declaration as a whole, rather than specifically identifying the statements it considers inadmissible.  *See* [Doc. 217 at 9 n.1].  Such objections are too vague, *see, e.g.*, *Gov't of Republic of China v. Compass Commc'ns Corp.*, 473 F. Supp. 1306, 1308 (D.D.C. 1979) (citing Rule 56(e), and finding the defendant's objection to an affidavit "on the grounds it contain[ed] hearsay and legal conclusions [was] too general to enable the Court to act"); and this Court declines to craft arguments on behalf of ARCO, who has been represented by able counsel since the inception of this action.  *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants).  The Court further notes that ARCO has disputed factual assertions made in the Powers Declaration where appropriate.  *See, e.g.*, [Doc. 217-1].

Accordingly, to facilitate a more expedient resolution, this Court will consider together the Powers Declaration and the underlying evidence referenced therein.  *See* Fed. R. Civ. P. 1.  But, as discussed further below, this determination does not extend to NL's arguments.  *See infra* note 10.

II.     **Undisputed Material Facts**

The Court finds the following undisputed facts material for purposes of resolving the Motion for Partial Summary Judgment:

**Historical Background**

1.      In approximately 1869, mining activities began in Rico, Colorado.  [Doc. 97-4 at 2; Doc. 97-5 at 3; Doc. 217-1 at ¶ 1].[5]

2.      Over the subsequent years, various mining companies, including RMRC and St. Louis, mined in Rico, Colorado.  [Doc. 97-4 at 2; Doc. 217-1 at ¶ 2].  Between 1930 and 1941, St. Louis constructed the approximately 6000-foot St. Louis Tunnel through which AMD flowed into the Delores River.  [Doc. 171 at ¶ 17; Doc. 217-1 at ¶ 4].

3.      In the 1950s, a crosscut from the Argentine Mine on the Silver Creek to the St. Louis Tunnel on the Delores River was completed.  [Doc. 217-30 at 43; Doc. 217-1 at ¶ 8].

**The EPA's Action at the Site in 2000**

4.      In 2000, the EPA completed "an emergency removal action to stabilize erosion that was occurring on ARCO's sludge ponds, and to stop the discharge of acidic water into the Dolores River."  [Doc. 217-1 at ¶ 33; Doc. 97-23; Doc. 97-17 at 3].

5.      That action was described in an Action Memorandum dated June 22, 2000 ("2000 Action Memo"), issued by the EPA, the subject of which was to request "a Classic Emergency Removal Action at the Rico Town Pond (aka Rico Argentine) Site, located north of the town of Rico, Dolores County, Colorado."  [Doc. 97-23 at 2].

---

[5] For ease of reference, the Court cites the chart that ARCO attached to its Response to the Motion for Partial Summary Judgment, [Doc. 217-1], which sets out the full text of NL's "Statement of Undisputed Facts."  *Compare* [*id.* at 1 ("NL Defendant's Statement of Undisputed Facts and Atlantic Richfield's Response")] *with* [Doc. 202-1 at 1 (NL's "Statement of Undisputed Facts")].

6.     The 2000 Action Memo explained the purpose behind that removal action in relevant part as follows:

> The response . . . addressed the need to mitigate the threat posed by contaminated sludge and sediment in a settling pond with elevated concentrations of hazardous substances such as lead, cadmium and arsenic.  The uppermost settling pond, located below the Rico-Argentine Mine, was full and its riverside embankment had begun to erode.  The erosion had begun to allow water, sediment, and sludge from the settling pond to flow directly into the Dolores River.  Conditions existing at the Site presented an imminent and substantial endangerment to human health and the environment and met the criteria for initiating a Classic Emergency Removal Action under 40 CFR, § 300.415(b)(2) of the National Contingency Plan (NCP).

[*Id.*].

7.     The 2000 Action Memo described the Site location as "[t]he Rico Mountains of southwestern Colorado and encompasses approximately 75 acres of settling ponds and tailings piles north and east of the town of Rico in Eastern Dolores County, Colorado."  [*Id.* at 3].

**2010 Action Memorandum**

8.     The EPA issued an Action Memorandum dated December 21, 2010 ("2010 Action Memo").  [Doc. 217-30 at 42–73].  The subject of the 2010 Action Memo was similarly to request a "Time-Critical Removal Action at the Rico-Argentine St. Louis Tunnel/Settling Ponds Site in Dolores County, Colorado."  [*Id*. at 42; Doc. 224-1 at ¶ 10].

9.     The site was identified as the "Rico-Argentine Site," and the physical location was described as follows:

> The Rico Site is located north of the Town of Rico, in Dolores County, Colorado, in portions of Sections 24 and 25, Township 40 North, and Rage 11 West. The general Site location is shown in Figure 1. Rico is 45 miles due south of Telluride in southwestern Colorado. The Site is adjacent to the Dolores River and extends into Telescope Mountain and its related mine workings. The St. Louis Tunnel Adit[6] and associated settling ponds are located on the eastern edge of Dolores

---

[6] "[A]dit: a horizontal passage leading into a mine for the purposes of access or drainage." *New Mexico on behalf of New Mexico Env't Dep't v. United States Env't Prot. Agency*, 310 F. Supp.

County approximately ½ mile north of the town of Rico. The settling ponds area is on the eastern bank of the Dolores River and occupies about 80 acres at an altitude of 8,800 feet.

[Doc. 217-30 at 46].

10.   The site was further characterized as consisting of "an Adit (known as the St. Louis Tunnel) and associated underground mine workings and a series of at least 18 ponds historically used for settling water treatment metals precipitate and storing other waster over time." [Doc. 217-30 at 47].

11.   The 2010 Action Memo stated that "[t]he conditions at this Site meet the criteria set out in the National Contingency Plan ('NCP') at 40 CFR 300.415(b)(2) and thus warrant a removal action." [Doc. 217-30 at 42]. According to the EPA, the objective of the proposed removal action was to "minimize or prevent the on-going release and potential release of hazardous substances (both aqueous and solid waste) being discharged from the St. Louis Tunnel and the associated settling ponds into the Dolores River and surrounding wetlands." [*Id.* at 52].

12.   The 2010 Action Memo contemplates that "[t]he removal action is planned to be a PRP-lead action." [*Id.* at 55].

**The Unilateral Administrative Order**

13.   The EPA subsequently issued a Unilateral Administrative Order for Removal Action ("2011 UAO" or "UAO"), effective March 23, 2011, against ARCO. *See* [*id.* at 74–95]. The UAO directed ARCO to "conduct removal actions . . . to abate an imminent and substantial endangerment  to the public health or welfare or the environment that may be presented by the actual or threatened release of hazardous substances at or from the Site." [*Id.* at 76, ¶ 2].

---

3d 1230, 1239 n.4 (D.N.M. 2018) (citing Oxford Living Dictionaries, British & World English. Retrieved from: https://en.oxforddictionaries.com/definition/adit).

14.    Under the 2011 UAO, the "Site" is defined as follows:

The Rico-Argentine Site is located in southwest Colorado, 25 miles southwest of the town of Telluride and just north of the town of Rico, within the northeastern corner of Dolores County. The Site is located in the San Juan Mountains, and within the Upper Dolores River Watershed. The Site consists of an adit (known as the St. Louis Tunnel) and associated underground mine-workings, as well as a series of settling ponds, some of which are back-filled, some of which contain sludge material. . . .

The St. Louis Tunnel adit drains historical mine workings extending several thousand feet into Telescope Mountain and Dolores Mountain to the east and southeast, respectively. The Site is or was directly hydraulically connected to the mine workings of the former Pigeon, Logan, Wellington, Mountain Spring, Argentine, Blaine, and Blackhawk mines in the area. The workings that are connected direct infiltrating groundwater to the St. Louis Tunnel. As groundwater travels through the workings, oxidation of mineralized rock increases the heavy metal concentrations in the discharging water.

[*Id.* at 78, ¶¶ 7–8].

15.    A copy of the following map defining the "Site" that originally appeared as part of the 2010 Action Memorandum, was incorporated into the UAO, *see* [*id.* at 58]:



16.     Pursuant to the UAO, ARCO was required to perform the following actions in response to the release of hazardous substances at the Site:

a. Management of precipitation solids in the settling ponds below the St. Louis Tunnel adit discharge, including partial removal of solids from the upper ponds;

b. Construction of an on-Site solids repository in accordance with the siting requirements of the Colorado 1-IMWMD and Dolores County;

c. Investigation of actions that can be feasibly implemented at the collapsed St. Louis Tunnel portal to stabilize the adit opening and consolidate adit flows;

d. Development of a preliminary design (30%) for appropriate hydraulic controls at or near the adit opening to manage flows entering the treatment system;

e. Construction, as appropriate, of hydraulic controls at or near the adit opening to manage flows;

f. Development of a preliminary (30%) design for a new treatment system for the St. Louis Tunnel adit discharge, including upgrades to pond embankments and hydraulic structures . . . ; and

g. Construction of a water treatment system to address the adit discharge.

[*Id.* at 83, ¶ 31].

17.     The 2011 UAO appended and incorporated the 2010 Action Memo.  [*Id.* at 76–77].

18.     After the EPA issued the UAO, ARCO constructed, *inter alia*, a new water treatment system and permanent on-site disposal facility, and underwent other measures to comply with the UAO and enhance the effectiveness of the cleanup at the Site.  [Doc. 217-1 at ¶¶ 40–41]; *see also* [Doc. 97-26; Doc. 97-27].

**March 2014 Update**

19.     In the Rico Argentine St. Louis Tunnel Site Project Update March 2014 ("March 2014 Update"), in discussing its environmental response actions, the EPA refers back to the project set forth in the 2000 Action Memo and states: "In 2000, EPA conducted an emergency removal at the Rico-Argentine St. Louis Tunnel Site to prevent a breach where one of the ponds was overtopping."  [Doc. 97-17 at 3].

20.     The March 2014 Update also refers to the 2011 UAO, stating "[i]n 2011, Atlantic Richfield Company (ARCO) began work under an Administrative Order to prevent releases of contaminants from the site, and to determine a long-term water management solution." [*Id.*].

21.     The March 2014 Update describes "[t]he Rico-Argentine St. Louis Tunnel Site [as being] located adjacent to the Dolores River, north of the town of Rico, in Dolores County, Colorado" and consisting of "the St. Louis Tunnel and associated mine workings and a complex of open ponds." [*Id.* at 2].  It further describes the location as follows:

> Water discharging from the St. Louis tunnel contains elevated concentrations of metals, primarily cadmium and zinc, and is being released into the Dolores River and surrounding environment. In addition, Silver Creek, a tributary to the Dolores River flows through a portion of the site and is impacted by acid mine drainage. The St. Louis Tunnel is connected to mines on the east side of the Dolores River, the Mountain Springs mine to the north and the Rico-Argentine mining district (near Silver Creek) to the south. The tunnel is inaccessible due to a collapse and an estimated 75 foot debris plug. The first approximately 200 feet of the St. Louis Tunnel behind the opening collapsed, and the tunnel is partially exposed. Water in the mine comes in contact with highly mineralized surfaces that contaminates the water inside the mine workings. The majority of the contaminated water flows out of the St. Louis Tunnel and into a series of constructed ponds below. The ponds were used historically for lime treatment of the metals-laden water from the tunnel. The treated water flowed into the ponds where the metals precipitated and settled before the water discharged to the Dolores River. Treatment was discontinued in 1996, resulting in untreated, contaminated mine water discharging to the river, and lime-precipitation/metals sludge remained in 10 settling ponds adjacent to the river.

[*Id.* at 2–3].

22.     The March 2014 Update also recounts the work ARCO performed under the UAO to prevent releases of contaminants from the site and to determine a long-term water management solution.  [*Id.* at 4].

**2021 Administrative Settlement Agreement**

23.     On December 6, 2021, after the inception of this lawsuit, ARCO entered into an Administrative Settlement Agreement and Order on Consent for Removal Action (the "2021

AOC" or "AOC") with the EPA. The AOC continues and completes the work under the 2011 UAO. [Doc. 217-1 at ¶ 51]; *see generally* [Doc. 217-30 at 2–40].

24.     As part of the "Conclusions of Law and Determinations" within the AOC, ARCO is determined to be liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a). [Doc. 217-30 at 9–10].

25.     Under Paragraph 58 of the AOC, ARCO agreed to pay $400,000 to the EPA as a settlement for "Past Response Costs." [*Id.* at 22, ¶ 58]; *see also* [Doc. 217-1 at ¶ 52]. The AOC defines "Past Response Costs" as "all costs, including but not limited to direct and indirect costs, that the United States paid at or in connection with the Site through March 31, 2021, plus Interest on all such costs through such date." [Doc. 217-30 at 6].

26.     The AOC defines the Rico-Argentine Site as the location "depicted generally on the map attached as Attachment 1 to the [2010] Action Memorandum (Appendix A)." [*Id.* at 7]. The Site map reflected herein is the same "map attached as Attachment 1 to the [2010] Action Memorandum" referenced in the AOC. *Compare* [*id.*] *with* [*id.* at 57–58].

27.     The work performed under the AOC "continues and completes the work done under the UAO." [Doc. 217-1 at ¶ 51].

## III.   CERCLA Statutes of Limitations for Cost Recovery Actions and Contribution Claims

The following facts are not in dispute: (1) ARCO has not been subject to a civil action brought pursuant to CERCLA Sections 106 or 107; (2) in 2011, the EPA issued a UAO, pursuant to CERCLA Section 106(a), to ARCO, compelling ARCO to undertake certain response work to address hazardous substances found at the Rico-Argentine Superfund Site, located in Rico, Colorado as depicted in the map above; (3) ARCO undertook response work pursuant to that UAO; (4) ARCO initiated this action against NL in 2020, asserting a claim for cost recovery pursuant to Section 107(a); (5) in December 2021, ARCO and the Government entered into a settlement, as

memorialized by the AOC; and (6) ARCO amended its Complaint, and now asserts only a contribution claim against NL pursuant to CERCLA Section 113(f) in Count I. *See supra* Section II; [Doc. 171].

NL seeks partial summary judgment against ARCO on the grounds that ARCO's claim against NL is time-barred, with the exception of a $400,000 payment made to reimburse the EPA under the AOC to settle any past response costs incurred by the EPA. *See* [Doc. 202 at 4]; *see also* [Doc. 217-30 at 22, ¶ 58 ("Within 30 days after the Effective Date, Respondent shall pay to EPA $400,000 for Past Response Costs.")]. The Parties' dispute turns on which statute of limitations applies. NL argues that Section 113(g)(2) (actions for recovery of costs) applies to the remainder of ARCO's claim for contribution, whereas ARCO contends that its claims are governed by Section 113(g)(3) (contribution claims). *See* [Doc. 202 at 11–17; Doc. 217 at 13–17].

CERCLA provides two statutes of limitations relevant to the Parties' arguments before the Court: one for "actions for recovery of costs" under Section 113(g)(2), and the other for "contribution" claims under Section 113(g)(3). *See* 42 U.S.C. § 9613(g)(2), (3).

***Section 113(g)(2)***. With respect to actions to recover "costs," Section 113(g)(2) sets forth the following limitations periods:

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—
>
> (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>
> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

> . . .   A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

42 U.S.C. § 9613(g)(2).

   ***Section 113(g)(3).***   Separately, Section 113(g)(3) provides that an action for "contribution" must commence within three years of

> (A) the date of judgment in any action under this chapter for recovery of such costs or damages, or
>
> (B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

42 U.S.C. § 9613(g)(3).

   Despite the distinction between the statutory mechanisms for relief, NL contends that Section 113(g)(2) applies to ARCO's contribution claim brought pursuant to Section 113(f).  NL directs the Court to the Tenth Circuit's decision in *Sun Co., Inc. (R&M) v. Browning-Ferris, Inc.*, 124 F.3d 1187 (10th Cir. 1997), [Doc. 202 at 13–17; Doc. 221 at 7–11], wherein the Tenth Circuit applied Section 113(g)(2) (actions for recovery of *costs*) to the plaintiffs' *contribution* action.  In that case, the plaintiffs asserted a cost recovery action under Section 107(a) and a contribution action under Section 113(f), for costs they incurred remediating a hazardous waste site.  *See Sun Co.*, 124 F.3d at 1188–89.  Like ARCO, the *Sun Co.* plaintiffs incurred those costs pursuant to a unilateral administrative order issued by the EPA under CERCLA Section 106, 42 U.S.C. § 9606. *Id.* at 1189.  The Tenth Circuit determined that the statute of limitations under Section 113(g)(3) (contribution claims) did not apply to the plaintiffs' contribution claim because—even though the plaintiffs were seeking contribution from another PRP—the plaintiffs "incurred cleanup costs in

response to an EPA unilateral administrative order under § 106, which is not one of the triggering

events" under Section 113(g)(3). *Id.* at 1189.  In making this determination, the court observed

that "[u]nder CERCLA's statutory scheme," a Section 113(f) contribution action "seeks to recover

costs referred to in § 107 from PRPs whose liability is defined by § 107, but is governed by the

equitable apportionment principles established in § 113(f)." *Id.* at 1191.  The court then explained

why Section 113(g)(3) "makes it clear" that *all* contribution claims do *not* share the same statute

of limitations:

> PRPs against whom the government has brought a civil action under §§ 106 or 107
> and who incur cleanup costs will do so in one of two ways: either the suit will
> proceed to judgment or the parties will enter into a settlement. PRPs in either
> situation are expressly covered by the language of § 113(f): "A person may seek
> contribution . . . during or following any civil action under [§§ 106 or 107] of this
> title."  In addition, whether by judgment or settlement, the three[-]year limitations
> period of § 113(g)(3) will be triggered.  If the suit proceeds to conclusion, the
> limitations period begins running on the date of judgment.  42 U.S.C. §
> 9613(g)(3)(A).  If the parties settle, the limitations period begins running on the
> date of the administrative order embodying the settlement (for § 9622(g) de
> minimis settlements or § 9622(h) cost recovery settlements), or on the date of entry
> of a judicially approved settlement.  42 U.S.C. § 9613(g)(3)(B). A judgment has its
> own procedural safeguards, and CERCLA settlements are subject to publication in
> the Federal Register and a 30–day notice and comment period. 42 U.S.C. § 9622(i).

*Id.* at 1191–92.

In applying the limitations period for actions for recovery of *costs* under CERCLA Section

113(g)(2), on the other hand, the Tenth Circuit rejected the defendants' argument that Section

113(g)(2) "cover[ed] only the traditional 'cost recovery' action under § 107—which imposes strict,

joint and several liability on other PRPs." *Id.* at 1192.  The court explained that "[b]y its own

terms, § 113(g)(2) covers the 'initial action' for recovery of 'costs referred to' in § 107." *Id*.  Thus,

the court continued, nothing in the language of Section 113(g)(2) "excludes a contribution action,

which also seeks to recover an equitable portion of 'costs referred to' in § 107, *provided that*

*particular contribution action is the 'initial action' to recover such costs*." *Id.* (emphasis added).

The court ultimately held that:

> [a] PRP who incurred cleanup costs pursuant to a civil action under §§ 106 or 107 will have its contribution claim governed by the three[-]year limitations period set out in § 113(g)(3).  A PRP who incurred cleanup costs *in some other way, such as pursuant to an EPA unilateral administrative order*, will have its contribution claim governed by the limitations period in § 113(g)(2), which governs "initial actions" for recovery of such costs.

*Id.* at 1194 (emphasis added); *see also id.* at 1192 ("PRPs who have incurred cleanup costs in some other way are also covered by the language of § 113(f): 'Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under [§§ 106 or 107] of this title.'").

The *Sun Co.* court strictly relied upon the statutory language of Section 113(g)(3) as to what actions triggered the statute of limitations reflected in that section.  Here, there is no dispute that the contribution ARCO seeks to recover from NL arose from the costs incurred for the clean-up work mandated by the 2011 UAO, and as continued under the AOC.  *See* [Doc. 217-4]; *see also, e.g.*, [Doc. 217 (ARCO's assertion that its work "*under the 2011 UAO* and the 2021 AOC is distinguishable from the work at issue in the cases cited by NL" (emphasis added)); Doc. 217-1 at ¶ 51 (admitting that "the AOC work continues and completes the work done under the UAO")].  ARCO does not claim that it incurred the cleanup costs in this case pursuant to judgment from an action brought pursuant to CERCLA Sections 106 or 107, thus triggering the three-year limitations period under Section 113(g)(3)(A).  *See* [Doc. 171].  And despite ARCO's suggestion that the 2021 AOC[7] between ARCO and EPA constitutes an administrative order under CERCLA Section

---

[7] As previously mentioned, ARCO and EPA entered the 2021 AOC after ARCO filed the initial Complaint in this case.  *See* [Doc. 1].

122(h) (relating to cost recovery settlements)—one of the triggering events under Section 113(g)(3)(B), *see* [Doc. 217 at 13, 16–17]—ARCO does not dispute that CERCLA Section 122(h) applies to settlements for "costs incurred by the United States Government."[8] [Doc. 217 at 16–17]. And the only such settlement identified by the Parties is the $400,000 payment from ARCO to EPA under the 2021 AOC for "Past Response Costs," [Doc. 217-30 at 22, ¶ 58]—an amount which, notably, NL specifically excludes from the relief it seeks in the instant Motion for Partial Summary Judgment. *See, e.g.*, [Doc. 202 at 15 ("The EPA Reimbursement Payment is the only portion of the 'costs or damages' that relates to a CERCLA § 122(h) cost recovery settlement, and NL is not moving for summary judgment on that amount.")]. In other words, the only triggering event that ARCO identifies that expressly implicates Section 113(g)(3)'s three-year limitations period—an administrative order under CERCLA Section 122(h) (relating to cost recovery settlements), *see* 42 U.S.C. § 9613(g)(3)(B)—is a settlement amount that is not at issue in the Motion. Thus, under *Sun Co.*, ARCO's claims are governed by Section 113(g)(2). *See Sun Co.*, 124 F.3d at 1191–94.

ARCO nevertheless insists that the limitations period under Section 113(g)(3) (contribution claims) applies on the basis that "[a]ll CERCLA contribution claims—*whether the scenario under which they arise is expressly listed in 42 U.S.C. § 9613(g)(3)(A) and (B) or not*—are subject to the three-year statute of limitations in [S]ection 113(g)(3)." [Doc. 217 at 13–14 (emphasis added)].

---

[8] *See* 42 U.S.C. § 9622(h)(1); *see also id.* at § 9622(h)(4) ("A person who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement shall not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement."); *Waste Mgt. of Pennsylvania, Inc. v. City of York*, 910 F. Supp. 1035, 1043 (M.D. Pa. 1995) ("Section 122(h) only allows EPA to settle the City's claims for those clean-up costs incurred by the Government.").

The *Sun Co.* court rejected this exact argument.  *See Sun Co.*, 124 F.3d at 1192–93.  Indeed, the *Sun Co.* defendants argued that "the language of § 113(g)(3) makes it clear that Congress expressly chose a three-year limitations period for all contribution claims."  *Sun Co.*, 124 F.3d at 1192.  The Tenth Circuit acknowledged that "§ 113(g)(3) is subtitled 'Contribution,' and provides that '[n]o action for contribution for any response costs or damages may be commenced more than 3 years after—[the four enumerated triggering events].'"  *Id.* at 1192–93.  The court found that its "construction of the statute is not inconsistent with this language," explaining that:

> [a] contribution claim which is the "initial action," and thus governed by the six-year limitations period of § 113(g)(2), will not be commenced more than three years after any of the four enumerated triggering events, because none of those triggering events will ever occur.  By contrast, if a contribution action is *not* the initial action, then by definition a previous action will have been filed, and one of the four triggering events in § 113(g)(3) will occur.  In this way, Congress has provided an express statute of limitations to cover all CERCLA contribution actions, regardless of how the PRPs in question incurred their cleanup costs.  In effect, there are two different types of contribution actions under CERCLA, each governed by the same equitable rules of § 113(f) and each seeking to equitably apportion costs referred to in § 107, but governed by different statutes of limitations.

*Id.* at 1193.

ARCO does not dispute that the application of *Sun Co.* leads to the application of the limitations period under Section 113(g)(2) to its claims against NL.  Instead, ARCO contends that the Tenth Circuit's analysis in *Sun Co.* "is questionable, at best, in light of two later United States Supreme Court decisions"—*Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004), and *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007)—which apparently stand for the proposition that "a [S]ection 113(f) contribution claim no longer can be regarded as just a subset of a section 107(a) cost recovery claim as the Tenth Circuit conceived of it in *Sun Co.*" [Doc. 217 at 14].  In that vein, ARCO urges this Court to follow opinions from other circuit and district courts following these Supreme Court decisions, where the courts considered the statute of

limitations issue and applied Section 113(g)(3) to contribution claims regardless of whether the circumstances under which they arose is expressly listed in Section 113(g)(3)(A) and (B) or not. [*Id.* at 14–17].

ARCO is correct that courts outside of the Tenth Circuit—including federal circuit courts of appeal—have called the holding of *Sun Co.* into question. *See, e.g.*, *Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 712 (3d Cir. 2019); *Refined Metals Corp. v. NL Indus. Inc.*, 937 F.3d 928, 929–30 (7th Cir. 2019); *Morrison Enterprises, LLC v. Dravo Corp.*, 638 F.3d 594, 609 (8th Cir. 2011); *Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1117 (9th Cir. 2017). Indeed, NL argued before the Seventh Circuit that generally, "when a person resolves its liability to the United States or a State through a judicially approved settlement, . . . [s]uch a settlement starts the clock on the three-year statute of limitations for the contribution claim that accrues on the basis of that settlement." Brief of the Defendant-Appellee, NL Industries, Inc. at 64, *Refined Metals Corp. v. NL Indus. Inc.*, No. 18-3235 (7th Cir. Jan. 14, 2019), ECF No. 19. But neither *Cooper Industries* nor *Atlantic Research Corp.* expressly overturned the Tenth Circuit's holding in *Sun Co.*, and there is no other intervening authority from the United States Supreme Court or the Tenth Circuit that casts any direct doubt on it. *See* [Doc. 217 at 14 (ARCO's acknowledgment that "*Sun Co.* has not been expressly overruled").[9] Under these circumstances, this Court is bound by the clear precedent of the Tenth Circuit, regardless of how persuasive ARCO's opposing arguments may be. *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow

---

[9] A footnote in the Supreme Court's ruling in *Territory of Guam v. United States* refers to the three-year statute of limitations for CERCLA contribution claims, but does not resolve this precise issue. 141 S. Ct. 1608, 1614 n.4 (2021).

the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits.").

For these reasons, this Court respectfully disagrees with ARCO that its claims in this case are subject to the limitations for contribution actions under Section 113(g)(3) (contribution claims), and finds, under the application of *Sun Co.*, that NL's claims are subject to the limitations period(s) under Section 113(g)(2) (actions for cost recovery).

## IV.   Application of CERCLA Section 113(g)(2)

As mentioned above, Section 113(g)(2) applies two separate limitations periods, depending on whether the response action at issue is characterized as a "removal action" (3 years after completion of the removal action) or "remedial action" (within 6 years after initiation of physical on-site construction of the remedial action).  42 U.S.C. § 113(g)(2)(A) and (B).  CERCLA Section 9601, 42 U.S.C. § 9601, contains broad, often overlapping, definitions of "removal action" and "remedial action."  *See* 42 U.S.C. § 9601(23), (24); *see also Pub. Serv. Co. of Colo. v. Gates Rubber Co.,* 175 F.3d 1177, 1182 (10th Cir. 1999) (observing that "[e]lements of either response action may overlap and semantics often obscure the actual nature of the cleanup performed").  In *Gates Rubber Co.*, the Tenth Circuit summarized its understanding of the definitions of "removal" and "remedial" actions as follows:

> Generally, a removal action costs less, takes less time, and is geared to address an immediate release or threat of release.  In broad contrast, a remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health.  Remedial actions usually cost more and take longer.

175 F.3d at 1182 (citations and footnote omitted); *see also Bd. of Cnty. Comm'rs of Cnty. of La Plata v. Brown Grp. Retail, Inc.*, 768 F. Supp. 2d 1092, 1114–15 (D. Colo. 2011) (describing a "removal action" as "a short-term response to reduce the immediate threat from the hazardous substance release," and a "remedial action" as "a response action intended to permanently reduce

or eliminate the threat from the release when there is no immediate threat to public health"); *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1238–41 (9th Cir. 2005) (collecting cases, noting that "[a]ttempting to untie the Gordian knot of these definitions solely based on their plain meanings is . . . unavailing").

The determination of whether a response is a "removal action" or "remedial action" is a question of law. *See New York v. Next Millenium* [sic] *Realty, LLC*, 732 F.3d 117, 126 (2d Cir. 2013) ("Whether a suit to recover response costs under section 107 of CERCLA is a 'removal action' or a 'remedial action' is a question of law that we review de novo."); *Raytheon Constructors, Inc. v. ASARCO Inc.*, No. 96 N 2072, 2000 WL 1635482, at *13 (D. Colo. Mar. 31, 2000) ("The determination of whether a response qualifies as a 'removal' or 'remedial' action is a matter of law.").[10]

***Remedial Action.*** Here, the Court finds that it need not reach the issue of whether ARCO's cleanup at the Site is a "remedial action" or "removal action," for two reasons. First, it cannot be disputed that ARCO's claims would be time-barred if its cleanup were characterized as a "remedial action" and, therefore, subject to the six-year limitations period under CERCLA Section 113(g)(2)(B), triggered from the initiation of physical, on-site construction in 2011. *Compare* 42

---

[10] NL asserts that "[t]he briefing on this issue was fully and completely set forth in ECF 97 – NL's Motion for Summary Judgment (particularly at pages 13-22; ECF 120 - ARCO's Opposition (particularly at pages 13-21); and ECF 132 – NL's Reply (particularly at pages 16-12)." [Doc. 202 at 17]. But "[d]ue to space limitations," it continues, "NL will not fully set forth those arguments again, but briefly notes that ARCO's claims are time-barred by CERCLA's six-year Remedial Action Statute of Limitations which runs from 'initiation of physical on-site construction' of the remedial action." [*Id.*]. To the extent that NL seeks to incorporate by reference the arguments made in its previous Motion for Summary Judgment, [Doc. 97], the Court declines to consider such arguments here. Indeed, that motion addresses an inoperative pleading. *Compare* [Doc. 1 (Complaint)] *with* [Doc. 171 (First Amended Complaint)]. And NL fails to point to any order permitting it to exceed the page limitations of the instant Motion for Partial Summary Judgment simply by referring to arguments made in the first Motion for Summary Judgment.

U.S.C. § 9613(g)(2)(B) (requiring that actions be commenced "within 6 years after initiation of physical on-site construction of the remedial action") *with* [Doc. 217-1 at ¶ 40 (ARCO agreeing that the work started in 2011)] *and* [Doc. 1 (Complaint, dated January 8, 2020)]. Indeed, ARCO does not argue that its claims would be timely under Section 113(b)(2)(B)'s six-year statute of limitations. *See generally* [Doc. 217].

*Removal Action.* Second, assuming, without deciding, that ARCO's response is a "removal action," its claims still fail. This is because under applicable law, there can be only *one* "removal action" at a given site, and because of the prior removal action at the Site in 2000, ARCO cannot maintain its current claims against NL for contribution costs for its current "removal action." *See* [Doc. 202 at 19, 22; Doc. 221 at 14].[11] The Parties do not dispute that, in 2000, the EPA performed "an *emergency removal action* to stabilize erosion that was occurring on ARCO's sludge ponds, and to stop the discharge of acidic water into the Dolores River." [Doc. 217-1 at ¶ 33; Doc. 97-23; Doc. 97-17 at 3].

In *Cyprus Amax Minerals Co. v. TCI Pacific Communications, LLC*, 28 F.4th 996, 1015 (10th Cir. 2022), the Tenth Circuit held that "[i]n any given facility, there can be one removal action *plus* one remedial action." *See* [Doc. 202 at 19]. In so holding, the *Cyprus Amax Minerals* court relied upon *Colorado v. Sunoco, Inc.*, 337 F.3d 1233 (10th Cir. 2003). *See Cyprus Amax*

---

[11] The Court notes NL's argument that ARCO began its work at the ARCO Site more than 39 years ago. *See, e.g.*, [Doc. 202 at 4–8, 19–22]. However, NL makes this argument primarily to support its position that ARCO's response action in this case should be characterized as a "remedial action," as opposed to a "removal action." *See* [*id.*]. Thus, insofar as NL seeks to argue that pre-2000 response actions at the Site were also "removal actions" such that ARCO's claims were barred before 2000, the Court finds that NL has not sufficiently identified any earlier such "removal actions." *See United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir.2010) (noting it is "not th[e] court's duty to scour without guidance a voluminous record for evidence supporting [a litigant's] theory"). And, in any event, as discussed above, the Parties do not dispute that EPA indeed completed a "removal action" at the Site in 2000. *See* [Doc. 217-1 at ¶ 33].

*Minerals*, 28 F.4th at 1014–15.[12]   The district court in *Sunoco* concluded that Section 113(g)(2), i.e., CERCLA's cost recovery statute of limitations, anticipates only "one removal action and one remedial action per site."   *Sunoco,* 337 F.3d at 1240.   On appeal, the plaintiff argued that "multiple removal or remedial actions can be implemented at a single site, and the cost recovery statutes of limitation in CERCLA were intended by Congress to apply separately to each individual removal and/or remedial action."   *Id.*   The Tenth Circuit rejected the plaintiff's argument as "not supported by the text of" Section 113(g)(2):

> In our view, *this language indicates there will be but one "removal action" per site or facility, as well as a single "remedial action" per site or facility*. . . .   Our reading of the statute does not foreclose cost recovery actions that may be filed in some cases many years after the initial limitations period has run. The statute distinguishes between an "initial action" to recover costs and a "subsequent action or actions to recover further response costs." 42 U.S.C. § 9613(g)(2).   As long as the EPA or a state files an initial action for cost recovery within the time periods specified in § 9613(g)(2)(A) and (B), subsequent actions may be filed to recover "further response costs at the vessel or facility . . . at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response activity." *Id.*   Therefore, if response activity occurs after the limitations period has run, the cost of that activity may be recovered if an initial cost recovery action for the site was timely filed and the subsequent action is filed no later than three years after cessation of all response activity at the site.

*Sunoco*, 337 F.3d at 1241–42 (emphasis added).   Based on this analysis, the Tenth Circuit agreed with the district court's "single action" interpretation and affirmed its finding on this issue, holding that "the key issue in determining the timeliness of [the plaintiff's] action is when 'physical on-site construction of the first remedial action' occurred at the Site."   *Id.* at 1242 (brackets omitted) (quoting 42 U.S.C. § 9613(g)(2)(B)).

ARCO counters that "CERCLA does not limit the number of response actions at a site," arguing that NL's position "misstates the statute and the case law" and this rule is not "universal."

---

[12] NL also cites *Cyprus Amax Minerals* and *Sunoco* in the Motion.   *See* [Doc. 202 at 9, 18–19].

[Doc. 217 at 24]. Although ARCO cites some persuasive authority to support its position, *see* [*id.* at 24–27]—and it is well-taken that the application of the "single action" principle would essentially divest ARCO from pursuing contribution from any other PRPs based on circumstances that were presumably out of its control and appears contrary to the purpose of CERCLA—none of the non-Tenth Circuit cases are binding on this Court, especially in light of the Tenth Circuit's recent affirmation of its holding in *Sunoco* that "[i]n any given facility, there can be one removal action *plus* one remedial action." *Cyprus Amax Minerals*, 28 F.4th at 1015 (citing *Sunoco*, 337 F.3d at 1241); *see also Exxon Mobil Corp. v. United States*, 335 F. Supp. 3d 889, 916 (S.D. Tex. 2018) ("The Tenth Circuit's reasoning, which appears most consistent with the other courts that have considered the issue, that there can be only one removal action and only one remedial action per facility, is persuasive."); *New York State Elec. and Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 235 (2d Cir. 2014) (collecting cases); [Doc. 221 at 14 ("[I]t is undisputed that EPA already conducted a 'removal action' in 2000 at the ARCO Site to stabilize the erosion that was occurring on ARCO's sludge ponds, and to stop the discharge of acidic water into the Dolores River. Under the Tenth Circuit's *Sunoco* holding, there can only be one removal action per site, and that action was concluded two decades ago." (citation omitted))]. Again, without intervening authority, this Court must follow precedent set by the Tenth Circuit. *See Spedalieri*, 910 F.2d at 709 n.2; *United States v. Barrios*, 994 F. Supp. 1257, 1265 (D. Colo. 1998) (noting the court is "bound by Tenth Circuit precedent unless overruled *en banc* or superseded by a contrary Supreme Court decision").[13]

---

[13] Nor is this Court persuaded by ARCO's suggestion that there may be somehow different sites at issue. *See, e.g.*, [Doc. 217 at 27 (arguing "the work required of Atlantic Richfield by the 2011 UAO and the 2021 AOC at the St. Louis Tunnel Facilities is directed to a location and an environmental condition separate and distinct from the areas and conditions covered by Atlantic

Applying the *Sunoco* analysis here, the key issue in determining the timeliness of ARCO's action is when "completion of the [first] removal action" occurred at the ARCO Site. 42 U.S.C. § 9613(g)(2)(A); *cf. Sunoco*, 337 F.3d at 1242. The evidence in this case establishes, and the Parties do not dispute, that EPA completed the first removal action at the ARCO Site in 2000—i.e., approximately 20 years before ARCO filed the initial Complaint in this case. *Compare* [Doc. 1 (Complaint, dated January 28, 2020)] *with* [Doc. 97-23 at 2–3 (2000 Action Memo requesting "a Classic Emergency Removal Action" at the Site to "mitigate the threat posed by contaminated sludge and sediment in a settling pond with elevated concentrations of hazardous substances such as lead, cadmium, and arsenic," and noting that "[t]he actions discussed in this memorandum required less than 12 months and two million dollars to complete")] *and* [Doc. 97-17 at 3 (the EPA's March 2014 Update confirming that "[i]n 2000, EPA conducted an emergency removal at the Rico-Argentine St. Louis Tunnel Site to prevent a breach where one of the ponds was overtopping")] *and* [Doc. 217-1 at ¶ 33 (NL's and ARCO's agreement that "in 2000, EPA came to the ARCO Site, and did an emergency removal action to stabilize the erosion that was occurring on ARCO's sludge ponds, and to stop the discharge of acidic water into the Dolores River")].

---

Richfield's earlier . . . work and other historic actions mentioned in NL's Statement of Facts"). The evidence establishes that the response action performed by the EPA in 2000 was performed at the same Site that is at issue in this case. *Compare, e.g.*, [Doc. 217-30 at 46 (2010 Action Memo, describing the Site as "[t]he St. Louis tunnel Adit and associated settling ponds [that] are located on the eastern edge of Dolores County approximately ½ mile north of the town of Rico. The settling ponds area is on the eastern bank of the Dolores River and occupies about 80 acres at an altitude of 8,800 feet." (emphasis added))] with [Doc. 97-23 (2000 Action Memo, stating "[t]he Site is located in the Rico Mountains . . . and encompasses approximately 75 acres of settling ponds and tailings piles north and east of the town of Rico" (emphasis added))] and [Doc. 97-17 (Rico Argentine St. Louis Tunnel Site Project Update March 2014, issued by the EPA, noting that "[i]n 2000, EPA conducted an emergency removal at the Rico-Argentine St. Louis Tunnel Site to prevent a breach where one of the ponds was overtopping" and further referring to the 2010 Action Memo and 2011 UAO)].

In sum, whether ARCO's response actions at the Site are characterized as a "remedial action" or "removal action," the result is the same: ARCO's Section 113(f) contribution claim against NL is time-barred. Accordingly, NL's Motion for Partial Summary Judgment is **GRANTED** insofar as it seeks summary judgment as to ARCO's Section 113(f) contribution claim under Count I, with the exception of the $400,000 payment to the EPA pursuant to the 2021 AOC.

## V.   ARCO's Declaratory Judgment Claim under Count II

Under Count II, ARCO seeks declaratory relief pursuant to CERCLA and the Declaratory Judgment Act. *See* [Doc. 171 at ¶ 54 ("Pursuant to CERCLA section 113(g)(2), 42 U.S.C. § 9613(g)(2), the Court is authorized to enter a declaratory judgment on liability for past, present, and future response costs to be incurred by Atlantic Richfield.")]. It follows that any declaratory relief regarding the contours of the Parties' rights under CERCLA must be consistent with the rulings herein. Nevertheless, the Parties do not specifically address ARCO's claim under Count II, instead referring collectively to Plaintiff's "claims," *see generally* [Doc. 202; Doc. 217; Doc. 221].[14] Moreover, as previously noted, NL seeks only partial summary judgment on statute of limitations grounds, and carves out, at a minimum, "the potential exception of a $400,000 payment . . . to reimburse the United States" under the AOC. [Doc. 202 at 4]. This payment refers to Paragraph 58 of the AOC, under which ARCO agreed to pay $400,000 to the EPA as a settlement for "Past Response Costs." [Doc. 217-30 at 22, ¶ 58]; *see also* [Doc. 217-1 at ¶ 52]. The AOC defines "Past Response Costs" as

> all costs, including but not limited to direct and indirect costs, that the United States paid at or in connection with the Site through March 31, 2021, plus Interest on all

---

[14] For instance, NL asserts that "[o]nly $400,000 of ARCO's *claims* are covered by the CERCLA contribution claim statute. *The rest* are not and are barred under binding Tenth Circuit case law." [Doc. 202 at 4 (emphasis added)].

such costs through such date.

[*Id.* at 6].[15]  Despite this definition, however, NL appears to suggest that the $400,000 settlement

payment under the AOC may also cover limited *future* costs for EPA oversight.  *See* [Doc. 202 at

7 (NL designating the term "EPA Reimbursement Payment" as encompassing the "$400,000 past

reimbursement payment to the [EPA] . . . and limited future reimbursement payments for limited

EPA oversight")].

Accordingly, given the fact that the Parties have not expressly briefed the issue of

declaratory relief, and their respective obligations under CERCLA will not be fully resolved with

the instant Motion for Partial Summary Judgment, the Court declines to grant summary judgment

on any portion of Count II at this time.  *See New Mexico Off-Hwy. Veh. All. v. U.S. Forest Serv.*,

645 F. App'x 795, 803–04 (10th Cir. 2016) (explaining that the court is not required to make

arguments for parties); *cf. Cnty. Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1513 (10th Cir. 1991)

(suggesting, under circumstances not argued here, that declaratory relief may be available even in

the absence of recoverable past costs);  *City of Colton v. Am. Promotional Events, Inc.-W.*, 614

F.3d 998, 1006 (9th Cir. 2010) (collecting cases on the issue of "[w]hether a CERCLA plaintiff's

failure to establish liability for its past costs necessarily dooms its bid to obtain a declaratory

judgment as to liability for its future costs").

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)     Defendants NL Industries, Inc. and NL Environmental Management Services'

---

[15] Although the AOC became effective on December 6, 2021, the effective date of Paragraph 58
"shall be effective when EPA issues notice to [ARCO] that public comments received, if any, do
not require EPA to modify or withdraw from Paragraph 58."  [Doc. 217-30 at 39, ¶ 119].

Renewed Motion for Partial Summary Judgment [Doc. 202] is **GRANTED IN PART and DENIED IN PART**;

(2)     Summary judgment is **GRANTED** in favor of Defendants as to Plaintiff's contribution claim under Count I, with the exception of the $400,000 payment to the EPA pursuant to the AOC;

(3)     Summary judgment is **DENIED** insofar as Defendants seek dismissal of Plaintiff's claim under Count II; and

(4)     All other deadlines, including the Scheduling Conference set before Magistrate Judge Kristen L. Mix for June 12, 2023 at 10:00 a.m. [Doc. 237], **REMAIN SET**.

DATED: April 26, 2023                              BY THE COURT:

_____
Nina Y. Wang
United States District Judge