# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-00234-NYW-KAS

ATLANTIC RICHFIELD COMPANY,

      Plaintiff ,

v.

NL INDUSTRIES, INC. and
NL ENVIRONMENTAL MANAGEMENT SERVICES,

      Defendants.

---

## THIRD AMENDED SCHEDULING ORDER

---

**1.      DATE OF CONFERENCE AND APPEARANCES OF COUNSEL**

The conference is set to be held in Courtroom C-204 of the Byron G. Rogers United

States Courthouse, 1929 Stout Street, Denver, Colorado on April 23, 2025, at 11:00 a.m. (MDT).

Counsel for the parties are as follows:

| | |
|---|---|
| R. Kirk Mueller | Joel L. Herz |
| Gail L. Wurtzler | LAW OFFICES OF JOEL L. HERZ |
| DAVIS GRAHAM & STUBBS LLP | La Paloma Corporate Center |
| 3400 Walnut Street, Suite 700 | 3573 East Sunrise Drive, Suite 215 |
| Denver, Colorado 80205 | Tucson, Arizona 85718 |
| kirk.mueller@davisgraham.com | joel@joelherz.com |
| gail.wurtzler@davisgraham.com | |

*Attorneys for Plaintiff Atlantic Richfield
Company*

*Attorneys for Defendants NL Industries, Inc.
and NL Environmental Management
Services*

**2.      STATEMENT OF JURISDICTION**

This Court has jurisdiction over the subject matter of this action and over the parties pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.

**3.      STATEMENT OF CLAIMS AND DEFENSES**

**a.      Plaintiff Atlantic Richfield Company:**

Atlantic Richfield brings this action against NL Industries, Inc. and NL Environmental Management Services Inc. (jointly, "NL Defendants") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq*. ("CERCLA").  Atlantic Richfield seeks contribution under CERCLA  Section 113 for costs it has incurred, and will incur in the future, for work performed at a specific geographic location in the former Rico Mining District, Dolores County, Colorado in response to a CERCLA order issued by the United States Environmental Protection Agency ("EPA") and a subsequent CERCLA administrative settlement and order on consent with EPA.  In particular, Atlantic Richfield seeks contribution for costs it has incurred and will incur for work at the St. Louis Tunnel, its associated settling ponds, and certain underground mine workings connected to the St. Louis Tunnel and known as the Northwest Workings and the Argentine Workings (together, the "St. Louis Tunnel Facilities").  The work has been required by a Unilateral Administrative Order issued by EPA on March 23, 2011 ("UAO") and an Administrative Settlement and Order on Consent dated December 6, 2021, settling Atlantic Richfield's CERCLA liability to the United States ("AOC").

Instead of responding to Atlantic Richfield's claims as they are pled, the NL Defendants attempt to link and place at issue various separate projects performed years ago including

- 2 -

projects performed by parties other than Atlantic Richfield, projects performed under regulatory

programs other than CERCLA, and projects for which Atlantic Richfield has never alleged any

claims and for which Atlantic Richfield never incurred any costs.

There is no question that one or both of the NL Defendants are Potentially Responsible

Parties under CERCLA for the St. Louis Tunnel Facilities.  The NL Defendants are successors to

the Rico Mining and Reduction Company ("RMRC") and the St. Louis Smelting and Refining

Co. ("St. Louis").  Between 1925 and 1927, RMRC owned and operated various mines in the

Northwest Workings and the Argentine Workings with the financial backing of National Lead, a

predecessor of the NL Defendants.  St. Louis acquired all of RMRC's assets and liabilities in

1927 and continued to operate them.  Between 1930 and 1941, St. Louis constructed the

approximately 6,000-foot St. Louis Tunnel.  Historical documents indicate that this tunnel was

constructed for several reasons including transportation and drainage, and that owners of mine

workings connected to the tunnel were charged a drainage royalty by St. Louis.  By 1939, St.

Louis had completed construction of other workings including the Northwest Crosscut and the

Mountain Springs Raise, which connected with the St. Louis Tunnel.

As a result of work by St. Louis and RMRC, acidic water bearing dissolved metals,

referred to as "acid mine drainage" ("AMD"), collected in the hydrologically connected mine

workings, was transported through the St. Louis Tunnel, and drained into the Dolores River

watershed.  Periodic reports made by government mine inspectors during the 1930s document

their observations of water draining from the tunnel.  These reports are more reliable evidence of

actual conditions than the single wintertime photograph upon which the NL Defendants rely for

the assertion that no water was draining from the St. Louis Tunnel while NL's predecessors were

operating at the site.  The AMD discharging from the St. Louis Tunnel derives primarily from

sulfide ore bodies in the Northwest Workings in CHC Hill and Telescope Mountain, connected

to the St. Louis Tunnel by the Northwest Crosscut, and sulfide ore bodies in the Argentine

Workings in Dolores Mountain, connected to the St. Louis Tunnel by the Southeast Crosscut.

In 1943, St. Louis abandoned and relinquished all its assets in the Rico Mining District

and, in 1948, the company dissolved.  Its assets, property, debts, obligations, and liabilities were

distributed to and expressly assumed by National Lead Company, a predecessor to NL

Industries.

In December 2010, the EPA prepared an Action Memorandum (the "Memo") requesting

a Removal Action at the St. Louis Tunnel Facilities.  In the Memo, EPA stated that conditions

met the criteria set forth in the National Contingency Plan at 40 C.F.R. § 300.415(b)(2) and thus

warranted a Removal Action to "minimize or prevent the on-going release and potential release

of hazardous substances (both aqueous and solid waste) being discharged from the St. Louis

Tunnel and the associated settling ponds into the Dolores River and surrounding wetlands."  On

March 23, 2011, pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), EPA issued a

Unilateral Administrative Order requiring Atlantic Richfield to perform the Removal Action and

set forth a detailed Work Plan with a completion schedule (together, these documents are

referred to herein as the "UAO").  Atlantic Richfield subsequently resolved its CERCLA liability

to the United States in December 2021– including its liability for EPA's own costs incurred

while overseeing the implementation of the Removal Action and its liability for performing the

Removal Action itself – which settlement is memorialized in the AOC.  By its express terms, the

AOC supersedes and replaces the UAO and constitutes an administrative settlement pursuant to

which Atlantic Richfield may seek contribution under Section 113(f)(3)(B) of CERCLA, 42

U.S.C. § 9613(f)(3)(B).  Thereafter, Atlantic Richfield amended its complaint to assert a

contribution claim under Section 113 of CERCLA and delete its Section 107 cost recovery

claim.

The AOC governs the future course of the ongoing Removal Action at the St. Louis

Tunnel Facilities.  The work under the AOC continues the response action begun under the UAO

and concerns the same geographic location.  The Removal Action requires Atlantic Richfield to,

among other things, manage and treat AMD discharging from the St. Louis Tunnel Facilities and

to design and construct a treatment solids repository.  Since March 2011, Atlantic Richfield has

made substantial progress implementing the actions identified in the UAO and the AOC at a cost

exceeding $143 million dollars.  Additional work remains to be done including the construction

of the full-scale water treatment facility, operation of the system, and  hydraulic improvements at

the St. Louis Tunnel and Blaine Tunnel portals.  Future response costs will be substantial.  All

work has been performed pursuant to the UAO and the AOC, consistent with the National

Contingency Plan, 40 C.F.R. Part 300, and in accordance with work plans submitted to and

approved by EPA.

Although disposals and releases of hazardous substances by the NL Defendants'

predecessors contributed to the conditions that are being addressed by the Removal Action, the

NL Defendants have not participated in the Removal Action and have refused requests from

Atlantic Richfield to bear any of the costs of the Removal Action.

Atlantic Richfield asserts a claim for contribution pursuant to CERCLA § 113(f), 42

U.S.C. § 9613(f) *et seq.*, and a claim for declaratory judgment pursuant to 28 U.S.C. § 2201, and

CERCLA section 113(g)(2), 42 U.S.C. § 9613(g)(2), declaring that the NL Defendants are liable for their equitable share of response costs incurred and to be incurred by Atlantic Richfield to implement the Removal Action.  In addition, Atlantic Richfield seeks an award of its litigation costs, including its reasonable attorneys' fees and costs, expert witness fees, and all related expenses, an award of pre- and post-judgment interest, and such other and further relief as the Court deems just and equitable.

Having reviewed the NL Defendants' Statement below, it is necessary to clarify and confirm the limited scope of Atlantic Richfield's claims in this case.  These claims concern *only* the costs incurred or to be incurred in connection with the Removal Action required by the 2011 UAO and the 2021 AOC to capture and treat the AMD discharging from the St. Louis Tunnel Facilities.  Atlantic Richfield's claims in this case do not include any costs related to other tunnels, other mines or mine workings, mills, tailings ponds, a smelter, a sulfuric acid plant, cyanide leach heap operations, sludge ponds, or soils in the Town of Rico.  Nor do these claims include any costs for actions at the St. Louis Tunnel Facilities that Atlantic Richfield incurred prior to beginning work on the Removal Action pursuant to the 2011 UAO.

Atlantic Richfield and NL have widely divergent views on the matters truly at issue in this case.  For that reason, Atlantic Richfield anticipates NL will seek discovery and motion practice that exceed the proportionate scope for discovery and presumptive limits under the Federal Rules and exceed what is required to efficiently litigate this case through trial.

> **b.    NL Industries:**

Over a more than 80 year period, Atlantic Richfield Company, through a web of predecessor companies including The Anaconda Company (including Anaconda Copper and

Anaconda Minerals), International Smelting & Refining Company, Pelleyre Mining and Milling Company, and Rico-Argentine Mining Company aka RAMCO (collectively "ARCO"), recklessly befouled the environment through its massive mining and processing operations in and around the Town of Rico, Colorado.  ARCO vastly harmed the Town's drinking water supply, and the river that runs through Rico, the Dolores River.  Through its mines, mills, smelter, sulfuric acid plant and cyanide leach heap operations, ARCO also caused highly acidic water from tunnels and shafts that it built or expanded to drain into the Dolores River.

ARCO now tries to blame NL, after allegedly spending more than $143.4 million.  ARCO now tries to claim that NL has responsibility, because an alleged predecessor of NL, St. Louis Smelting and Refining Co. ("St. Louis"), built some portion of a tunnel into the mountain, largely for exploratory work.  What ARCO does not tell this Court is that by approximately 1944, ARCO bought that tunnel from NL's alleged predecessor, St. Louis.  What ARCO does not tell this Court is that in 1944, when ARCO bought the tunnel, there was no water draining out of the tunnel, as shown in contemporaneous pictures.  What ARCO does not tell this Court is that St. Louis had nothing to do with the sulfuric acid plant, the cyanide leach heaps, or the 18 sludge ponds that ARCO built on the ARCO Site – all of which post-dated any involvement of St. Louis.  Nor did St. Louis have anything to do with any milling or smelter operations at the ARCO Site.  All St. Louis materials were removed from the ARCO Site and taken to a processing facility in Utah and were not processed in Colorado.

More specifically, ARCO's actions converted the St. Louis Tunnel from an exploratory and ore haulage tunnel with a functioning locomotive system and electricity into a drainage

adit, which resulted in the commencement of the flow of water into the Dolores River that continues to this day.

More so, by 1955, ARCO built a sulfuric acid plant that spewed sulfuric acid into the air, deforesting the Town of Rico, and into the water, causing massive fish kills in the Dolores River. ARCO built cyanide leach heaps that caused highly toxic cyanide to go into the Dolores River. ARCO built a series of approximately 18 sludge ponds to deal with the hazardous wastes that its operations created.

Following the termination of ARCO's mining operations, ARCO allowed the mines, including the St. Louis Tunnel, to purposely flood, which apparently caused significantly more water to be discharged to the Dolores River. According to the State of Colorado, Bureau of Mines Information Report dated June 10, 1971: "Mining operations were ceased May 26, 1971 ... These lower levels will be allowed to flood, the St. Louis Tunnel is connected at the 500 level and any flooding above this elevation will be drained through this connection." The Colorado Bureau of Mines Information Report on the St. Louis Tunnel dated December 5, 1974 states in relevant part: "This tunnel provides drainage for the Rico Argentine and Blaine Mines. The mines are idle at present but drainage is maintained continuously."

In 1972, shortly after the intentional flooding of the mines, ARCO acquired the water rights to the discharge from the St. Louis Tunnel and the Blaine workings. (*See*, *In the Matter of the Application for Water Rights of Case No. W-802*, In the District Court in and for Water Division No. 7, State of Colorado, Case No. W-802 dated October 19, 1972 "St. Louis Tunnel" and *In the Matter of the Application for Water Rights of Case No. W-801,* In the District Court in and for Water Division No. 7, State of Colorado, Case No. W-801 dated October 19, 1972

- 8 -

"Blaine Tunnel"). The Recommendation of the Division Engineer in Case No. W-802 (the St. Louis Tunnel water rights) states that "this is the main water supply for the operation of the Mining Company. The water is developed from their main tunnel."  The Recommendation further notes that the "means of diversion" is "gravity flow."  In the application for Case No. W-802, Orval L. Jahnke, on behalf of Rico-Argentine, states that the amount of water claimed from the St. Louis Tunnel is 538 gallons per minute to be used for "drilling water, cooling water, domestic water and stock water."

According to an EPA summary, on August 11, 1974, a blowout occurred at the ARCO sulfuric acid plant. A buildup of cyanide liquor occurred in one area of the pile, and approximately 3,000 to 5,000 gallons of cyanide solution discharged into the Dolores River. The estimated number of fish killed was over 30,000; the extent of mortality in the first four miles of the river downstream of the discharge was 100%.  In May of 1976, EPA and ARCO's RAMCO entered a consent decree with respect to the cyanide discharge.

In 1980, the Colorado Department of Health issued a Notice of Violation and issued a Cease and Desist Order to ARCO.  In the early 1980's, ARCO began physical construction of a remedial action to treat the water being discharged from the St. Louis Tunnel as well as acidic water that was then being discharged from other adits, including the "Blaine adit."  ARCO physically constructed or placed a coffer dam to permanently redirect acidic water from the Blaine adit to the St. Louis Tunnel.  By 1984, ARCO had physically constructed a water treatment plant at the St. Louis Tunnel to permanently treat the water being discharged with lime before it entered into a series of settling ponds physically constructed by ARCO and its predecessors for additional treatment.  In the early 1980's, ARCO had physically stabilized the settling ponds, physically

- 9 -

plugged adits, and physically capped wells all with the goal of permanently remediating acidic water coming through the St. Louis Tunnel.  In October 1984, EPA conducted a site visit and prepared a sampling plan to govern continued remediation of the ARCO Site.

In 1988, ARCO abandoned its operation and maintenance of the water treatment remedy it had constructed and tried to pawn off its responsibilities on an unsophisticated real estate developer.  In doing so, ARCO failed to maintain the sludge ponds and the water treatment systems that it built such that ultimately, in 2000, EPA returned to the ARCO Site, and did an emergency removal action to stabilize the erosion that was occurring on ARCO's sludge ponds, and to stop the discharge of acidic water into the Dolores River.  By March 2011, EPA had enough of ARCO's failure to clean up its mess.  EPA ordered ARCO to finish remediating the environmental problems in a comprehensive Unilateral Administrative Order effective March 23, 2011 ("UAO").  ARCO tried to place blame on NL and sought to have NL named in the UAO that it was facing.  EPA refused to do so. That is because NL has done nothing wrong – it was ARCO's abandonment of the remedy that caused the problem.

NL disputes that it is the predecessor to RMRC and St. Louis, but even if it is, as the EPA properly found by not naming NL in the UAO, NL has done nothing wrong and has no liability.

4.    **UNDISPUTED FACTS**

The following facts are undisputed:

Effective March 23, 2011, EPA issued a UAO requiring Atlantic Richfield to perform the response actions set forth in the UAO.

Atlantic Richfield entered into an Administrative Settlement and Order on Consent with EPA.

As the case proceeds, the parties may be able to identify additional undisputed facts.

**5.    COMPUTATION OF DAMAGES**

**a.    Plaintiff's Current Computation of Damages**

Atlantic Richfield has incurred response costs paid to environmental contractors and vendors for engineering and other technical services and to EPA as reimbursement for response costs incurred by the Agency.  Costs include those associated with water sampling, laboratory analysis, flow monitoring, report preparation, treatment system design, treatment system construction and monitoring, well drilling, geotechnical investigations, source investigations, tunnel stabilization, design and construction of hydraulic controls, road maintenance, pond and dike improvements, and solids management.

Approximate costs paid by year (through 1Q 2025) were (in millions):

| 2011-2021 | 2022 | 2023 | 2024 | 2025 (1Q) | Total |
|-----------|------|------|------|-----------|-------|
| $83.5 | $16.0 | $16.87 | $23.1 | $3.9 | $143.4 |

Atlantic Richfield estimates it will incur additional costs completing construction of the St. Louis Tunnel water treatment system in the approximate amount of $20 to $30 million during 2025 and 2026, with additional costs attendant to on-going operation and monitoring into the future.  Atlantic Richfield has also incurred and will incur attorney fees and litigation costs pursuing this lawsuit for contribution against the NL Defendants.

**b.    Defendants' Computation of Damages**

At the present time, NL has not incurred any damages.

**6.    REPORT OF PRECONFERENCE DISCOVERY AND MEETING UNDER FED. R. CIV. P. 26(f)**

a.      Dates of Rule 26(f) meeting.

The Fed.R.Civ.P. 26(f) meetings were held on: (1) July 2, 2020, between counsel for

Atlantic Richfield and the NL Defendants (the only parties at that time); (2) at various dates in

July and August 2021, September 2022, November 2022, January 2023, by telephone and email

communications among counsel for the parties to this scheduling order and counsel for different

entities who were then third-party defendants; and (3) May 25, 2023, and April 2025 between

counsel for Atlantic Richfield and the NL Defendants.

b.      Names of each participant and party he/she represented.

R. Kirk Mueller
Gail L. Wurtzler
DAVIS GRAHAM & STUBBS LLP
3400 Walnut Street, Suite 700
Denver, Colorado 80205
kirk.mueller@davisgraham.com
gail.wurtzler@davisgraham.com

*Attorneys for Plaintiff Atlantic Richfield
Company*

Joel L. Herz
LAW OFFICES OF JOEL L. HERZ
La Paloma Corporate Center
3573 East Sunrise Drive, Suite 215
Tucson, Arizona 85718
joel@joelherz.com

*Attorneys for Defendants NL Industries, Inc.
and NL Environmental Management
Services*

c.      Statement as to when Rule 26(a)(1) disclosures were made or will be made.

Atlantic Richfield and the NL Defendants made their initial Rule 26(a)(1) disclosures on

October 15, 2020.

Atlantic Richfield: Supplemental Rule 26(a)(1) disclosures: June 7, 2026.

NL:  At this juncture NL has nothing further to disclose.  NL has already produced more

than 64,000 pages of documents with its Initial Disclosure Statement.  As ARCO is aware, EPA

provided NL with a March 7, 2001 request for information under Section 104(e) of CERCLA

- 12 -

and in 2001 – more than 24 years ago – NL provided a comprehensive response and ARCO has

had the benefit of those documents and information for more than 24 years.  In addition to

providing its updated damages, ARCO should be required to provide greater detail on the more

than 20 witnesses it has listed in its Initial Disclosure Statement and their knowledge.

        d.        Proposed changes, if any, in timing or requirement of disclosures under Fed. R.
                       Civ. P. 26(a)(1).

See above.

        e.        Statement concerning any agreements to conduct informal discovery:

No agreements regarding informal discovery have been reached at this time.

        f.        Statement concerning any other agreements or procedures to reduce discovery and other
                       litigation costs, including the use of a unified exhibit numbering system.

No agreements regarding informal discovery have been reached at this time but the

parties will communicate and discuss options to expedite disposition of the case and to save costs

as opportunities arise.  Parties shall use a unified numbering system for depositions.

        g.        Statement as to whether the parties anticipate that their claims or defenses will involve
                       extensive electronically stored information, or that a substantial amount of disclosure or
                       discovery will involve information or records maintained in electronic form.

It is likely that claims and defenses in this lawsuit will involve extensive amounts of

electronically stored information.  The parties have agreed to preserve all such information and

to confer about the most efficient means for formatting, producing and exchanging such

information as discovery proceeds.  Parties shall adhere to Sedona Principles re electronic

discovery disputes.

        h.        Statement summarizing the parties' discussions regarding the possibilities for
                       promptly settling or resolving the case.

Atlantic Richfield and the NL Defendants engaged in discussions regarding the possibilities for promptly settling or resolving the case, including discussions mediated by the Tenth Circuit Mediation Office while this matter was on appeal to that Court.  In 2024, counsel for NL also tendered a written settlement offer to Atlantic Richfield in the context of attempting to settle an unrelated matter involving NL and Atlantic Richfield, which Atlantic Richfield deemed unacceptable.  The parties do not believe that a prompt resolution is likely at this time.

**7.    CONSENT**

All parties have not consented to the exercise of jurisdiction of a magistrate judge.

**8.    DISCOVERY LIMITATIONS**

a.    Modifications which any party proposes to the presumptive numbers of depositions or interrogatories contained in the Federal Rules.

Atlantic Richfield: None at this time.  The parties reserve the right to confer with each other if they believe modifications are needed as discovery proceeds and, if they do not agree, to seek leave for modifications from the Court.

NL:  NL expects that its discovery will need to focus on, *inter alia*, the following:

o    What disposal there was of any hazardous substance at any facility that was owned or operated by the alleged predecessors of NL, at which such hazardous substances were disposed of, in order to make the alleged predecessors of NL liable under Section 107(a)(2) of CERCLA as alleged by ARCO.

o    What contract or agreement was made by the alleged predecessors of NL, or how the alleged predecessors of NL otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by the alleged predecessors of NL or by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances to make the alleged predecessors of NL liable under Section 107(a)(3) of CERCLA as alleged by ARCO.

o  How the alleged predecessors of NL accepted any hazardous **substances for transport to disposal or treatment facilities, incineration vessels** or sites selected by the alleged predecessors of NL from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, to make the alleged predecessors of NL liable under Section 107(a)(4) of CERCLA as alleged by ARCO.

o  How ARCO incurred any necessary costs of response consistent with the national contingency plan.

o  Allocation factors pursuant to Section 113 of CERCLA.

o  The mining done over a more than 80-year period by Atlantic Richfield Company, through a web of predecessor companies including The Anaconda Company (including Anaconda Copper and Anaconda Minerals), International Smelting & Refining Company, Pelleyre Mining and Milling Company, and Rico-Argentine Mining Company aka RAMCO.

o  How ARCO and its predecessors befouled the environment through their massive mining and processing operations in and around the Town of Rico, Colorado.

o  How those companies vastly harmed the Town of Rico's drinking water supply, and the river that runs through Rico, the Dolores River.

o  The volume and extent of the mines, mills, smelter, sulfuric acid plant and cyanide leach heap operations of ARCO and others.

o  How ARCO caused highly acidic water from tunnels and shafts that it built or expanded to drain into the Dolores River.

o  The impact of ARCO's operation of the sulfuric acid plant, the cyanide leach heaps, or the 18 sludge ponds that ARCO built on the ARCO Site.

o  Whether NL is the legal successor to either Rico Mining and Reduction Company ("RMRC") or the St. Louis Smelting and Refining Co. ("St. Louis").

o  ARCO's acceptance in approximately 1943, of all of the assets of the alleged predecessors of NL that might have been related to the ARCO Site.

o  ARCO's 1944 purchase of the tunnel from NL's alleged predecessor, St. Louis.

o   Whether there was, in 1944, when ARCO bought the tunnel, any hazardous substances draining out of the tunnel, and if yes, how much.

o   ARCO's actions converting the St. Louis Tunnel from an exploratory and ore haulage tunnel with a functioning locomotive system and electricity into a drainage adit, which resulted in the commencement of the flow of water into the Dolores River that continues to this day.

o   How ARCO allowed the mines, including the St. Louis Tunnel, to purposely flood, which apparently caused significant amounts of water to be discharged to the Dolores River.

o   ARCO's acquisition of water rights after its intentional flooding of the mines, to discharge from the St. Louis Tunnel and the Blaine workings.  (*See*, *In the Matter of the Application for Water Rights of Case No. W-802*, In the District Court in and for Water Division No. 7, State of Colorado, Case No. W-802 dated October 19, 1972 "St. Louis Tunnel" and *In the Matter of the Application for Water Rights of Case No. W-801,* In the District Court in and for Water Division No. 7, State of Colorado, Case No. W-801 dated October 19, 1972 "Blaine Tunnel").

o   The August 11, 1974 blowout that occurred at the ARCO sulfuric acid plant including the approximately 3,000 to 5,000 gallons of cyanide solution discharged into the Dolores River and the 30,000 fish killed.

o   The May 1976 EPA and ARCO consent decree with respect to the cyanide discharge.

o   ARCO's 1988 abandonment of its operations and maintenance of the water treatment remedy it had constructed and sale to a real estate developer.

o   ARCO's failure to maintain the sludge ponds and the water treatment systems that it built.

o   The EPA 2000 emergency removal action to stabilize the erosion that was occurring on ARCO's sludge ponds, and to stop the discharge of acidic water into the Dolores River.  The work done under the Unilateral Administrative Order effective March 23, 2011 ("UAO") and EPA's decision to not name NL in the UAO.

o   The reasons for ARCO's delay in suing NL and spoliation of documents or information by ARCO.

o   Defense allowed by CERCLA.

o   The value of the minerals at the Site owned by ARCO.

- 16 -

- o   ARCO and its predecessors profits from the Rico Mines and Site.

- o   ARCO's acquisition of property at the ARCO Site.

**Expert Discovery**

NL expects to take discovery of any experts that are proffered by ARCO.

**Non- Party Discovery**

- o   EPA. Discovery will include the work that EPA ordered ARCO to take and EPA's decision to not name NL in any orders.

- o   State of Colorado, Bureau of Mines.  Discovery will include the amount of mining and waste created by ARCO, its predecessors and others, any permits obtained, and the amounts of waste created, and the drainage that was created.

- o   The Colorado Department of Health.  Discovery will include its issuance of a Notice of Violation and Cease and Desist Order to ARCO.

- o   The Former Third Party Defendants including United States of America, U.S. Department of the Interior acting through the Bureau of Land Management ("BLM"), U.S. Department of Agriculture acting through the U.S. Forest Service ("Forest Service"), and other current and former departments, agencies, and instrumentalities of the United States government (collectively "United States"), Outlook Resources, Inc. ("Outlook Resources"), Disposition Properties, LLC ("Disposition Properties"), El Paso Remediation Company ("El Paso Remediation"), as a successor by merger to Rico Argentine Mining Company ("RAMCO") and as the successor to Crystal Oil Company ("Crystal Oil"), Chemetall Foote Corporation, as successor to Vanadium Corporation of America ("Chemetall Foote"), Redpath USA Corporation fka J.S. Redpath Corporation ("Redpath"),  and Boyles Bros. Drilling Company ("Boyles Bros.").  Discovery is expected to be taken on their ownership and operator roles at the ARCO Site.

- o   Currently unknown other owners and operators at the ARCO Site.  Discovery is expected to be taken on their ownership and operator roles at the ARCO Site.

Depending on what can and what cannot be stipulated to, NL suggests that upwards of 25 fact depositions may be required and more than 50 interrogatories and document requests will be required.  Further, there will likely be additional discovery that will be needed on the proprietary

of entry into an Administrative Order on Consent.

b.      Limitations which any party proposes on the length of depositions.

Atlantic Richfield: Depositions shall not exceed seven hours.

NL: NL submits that certain depositions may need to exceed seven hours, particularly, a Rule 30(b)(6) deposition of ARCO and deposition of EPA.  As noted above, ARCO is alleging conduct on the part of alleged NL predecessors that occurred prior to 1942.  Attempting to figure out what happened, or what ARCO is alleging happened more than 80 years ago, and over the ensuing 80 years by ARCO, is likely going to be time consuming, requiring depositions longer than seven hours.

c.      Limitations which any party proposes on the number of requests for production and/or requests for admission.

Atlantic Richfield: Each side as between Plaintiff and Defendants shall be limited to thirty requests for production and thirty requests for admission.  The parties reserve the right to confer with each other if they believe modifications are needed as discovery proceeds and, if they do not agree, to seek leave for modifications from the Court.

NL: 50 requests to production to ARCO and 80 requests to admit to ARCO.

d.      Deadline for service of Interrogatories, Requests for Production of Documents and/or Admissions:

Atlantic Richfield: March 6, 2026.

NL: April 6, 2026.

e.      Other Planning or Discovery Orders

The parties filed a proposed Order under F.R.E. 502(d) and the Court entered it on August 18, 2020.  ECF No. 22.

9.     **CASE PLAN AND SCHEDULE**

      a.      Deadline for Joinder of Parties and Amendment of Pleadings:

Atlantic Richfield: This deadline has passed.

NL: NL agrees that unless this Court changes it ruling that ARCO is responsible for the Third-Party Defendants sued by NL who have now been dismissed by the Court's ruling, that ARCO has sole responsibility for these entities.

      b.      Discovery Cut-off and Deadline to Make Discovery Motions:

Atlantic Richfield: August 7, 2026.

NL: September 8, 2026.

      c.      Dispositive Motion Deadline:

Atlantic Richfield: September 8, 2026.

NL: November 8, 2026.

      d.      Expert Witness Disclosure

           1.      The parties shall identify anticipated fields of expert testimony, if any.

Atlantic Richfield:  Atlantic Richfield anticipates it may designate one or more retained experts in mining operations including historic mining operations in the Rico Mining District, water treatment, hydrology, hydrogeology, geochemistry, allocation, accounting, and compliance with the National Contingency Plan ("NCP").

NL:  As set forth above, all conduct alleged of NL's alleged predecessor ended by 1941 – more than 84 years ago.  NL does not believe that there are any individuals who are still alive who were employed by NL's alleged predecessors prior to 1941.  Thus, NL's defense of the

ARCO claims will be heavily dependent on expert witnesses. NL also anticipates it may

designate one or more retained experts in historic mining operations in the Rico Mining District,

hydrology, hydrogeology, geochemistry, accounting, and compliance with the NCP.

2.      Limitations which the parties propose on the use or number of expert
        witnesses.

Atlantic Richfield: No more than 6 retained experts per party (excluding experts

disclosed under Fed. R. Civ. P. 26(a)(2)(C) who do not provide a written report).

NL: No limit should be placed on expert opinions at this time. ARCO is seeking at

least $143.5 million from NL for its alleged past costs and expects to seek at least another

$20 to $30 million more for a total of approximately $173 million. The burden of proof on

all issues is on ARCO. ARCO has listed 8 areas of expert testimony above. NL believes

that ARCO has many employees who may be providing expert opinions who may not

provide an expert report. NL should not be constrained by any expert limit at this time,

particularly since no discovery has been taken, and the case involves over $173 million.

3.  The parties shall designate all experts and provide opposing counsel with all

information specified in Fed. R. Civ. P. 26(a)(2) on or before _____.

Atlantic Richfield:  April 7, 2026.

NL:  ARCO has been working on the cleanup of the ARCO Site for more than 50

years including more than 14 years under the UAO and more than 3 years under its

settlement with EPA. At this juncture, ARCO should have a pretty good idea of its opinions

as to why NL is liable, and what allocation it attributes to NL instead of the other persons it

decided not to sue, and who ARCO is responsible for, not NL. ARCO should disclose its

experts early in this litigation, no later than November 1, 2025, and NL should be afforded

an eight month period to take discovery based on what those experts opine, and in turn hire

experts to counter the opinions of ARCO's experts.  Nothing here suggests that ARCO

needs any discovery from NL to determine what its experts might want to say.  As noted

above, there are no known living witnesses who were involved in the ARCO Site from NL's

alleged predecessors – all of which pre-date 1941.  Further, NL has already produced to the

EPA, a number of years ago, all of the documents that it could find that related to the

ARCO Site, and ARCO has had the benefit of those documents for many years.

    4.    The parties shall designate all rebuttal experts and provide opposing counsel with all information specified in Fed. R. Civ. P. 26(a)(2) on or before _____.

Atlantic Richfield: June 6, 2026.

NL: *See* Section 3 above for NL position.

e.    Identification of Persons to Be Deposed:

Atlantic Richfield anticipates it will take Fed. R. Civ. P. 30(b)(6) depositions of

representatives of the NL Defendants.  Atlantic Richfield also anticipates it will take depositions

of persons involved in the preparation of NL's 2001 response to EPA's March 7, 2001 request

for information under Section 104(e) of CERCLA and persons who have executed affidavits or

declarations on the NL Defendants' behalf attesting to historical facts in connection with the

summary judgment briefing in this case and the Tenth Circuit appeal.  Atlantic Richfield may

conduct additional depositions of persons with knowledge identified in the NL Defendants'

disclosures and discovery responses.

NL anticipates it will take Fed. R. Civ. P. 30(b)(6) depositions of representatives of

ARCO and potentially other companies whose potential liability ARCO has assumed in this

litigation. NL anticipates that it will take depositions of employees of the United States EPA and

the State of Colorado. It anticipates that it will take depositions of contractors and consultants

employed by ARCO that have been involved in the cleanup of the Site. NL expects to conduct

additional depositions of persons with knowledge after they are identified in the ARCO

supplemental disclosures and discovery responses.

**10.    DATES FOR FURTHER CONFERENCES**

*[The magistrate judge will complete this section at the scheduling conference if he or she has not already set deadlines by an order filed before the conference.]*

    a.    Status conferences will be held in this case at the following dates and times:

_____.

    b.    A final pretrial conference will be held in this case on _____at o'clock \_\_\_\_\_m. A Final Pretrial Order shall be prepared by the parties and submitted to the court no later than seven (7) days before the final pretrial conference.

**11.    OTHER SCHEDULING MATTERS**

    a.    Identify those discovery or scheduling issues, if any, on which counsel after a good faith effort, were unable to reach an agreement.

Those discovery and scheduling issues are identified above in context.

    b.    Anticipated length of trial and whether trial is to the court or jury.

Atlantic Richfield: Ten trial days and trial to the Court.

NL: NL anticipates that this trial involving a mining history of over 100 years and a

cleanup that has already lasted more than 37 years and expected to cost more than $175 million

will take approximately 30 days to try.

    c.    Identify pretrial proceedings, if any, that the parties believe may be more efficiently or

economically conducted in the District Court's facilities at 212 N. Wahsatch Street, Colorado Springs, Colorado 80903-3476; Wayne Aspinall U.S. Courthouse/Federal Building, 402 Rood Avenue, Grand Junction, Colorado 81501-2520; or the U.S. Courthouse/Federal Building, , La Plata County Courthouse, 1060 E. 2nd Avenue, Suite 150, Durango, Colorado 81301.

None.

## 12.    NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with

D.C.COLO.LCivR 6.1(c) by serving the motion contemporaneously upon the moving attorney's

client.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or

Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.COLO.LCivR 7.1(a).

Counsel and unrepresented parties are reminded that any change of contact information

must be reported and filed with the Court pursuant to the applicable local rule.

## 13.    AMENDMENTS TO SCHEDULING ORDER

This scheduling order may be altered or amended only upon a showing of good cause.


DATED at Denver, Colorado, this _____day of _____, 2025.

BY THE COURT:


_____

United States Magistrate Judge

APPROVED:

_/s/ Gail L. Wurtzler_____
R. Kirk Mueller
Gail L. Wurtzler
DAVIS GRAHAM & STUBBS LLP
3400 Walnut Street, Suite 700
Denver, Colorado 80205
kirk.mueller@davisgraham.com
gail.wurtzler@davisgraham.com

*Attorneys for Plaintiff Atlantic Richfield
Company*

_/s/ Joel L. Herz_____
Joel L. Herz
LAW OFFICES OF JOEL L. HERZ
La Paloma Corporate Center
3573 East Sunrise Drive, Suite 215
Tucson, Arizona 85718
joel@joelherz.com

*Attorneys for Defendants NL Industries, Inc.
and NL Environmental Management
Services*